1
2
3
4
5
6
7
8           IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DARIOUS A. MAYS,

11          Petitioner,                    No. CIV S-10-533 LKK CHS

12      vs.

13   KEN CLARK, Warden,

14          Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                        I.  INTRODUCTION

17          Mays, a state prisoner, proceeds pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  At issue is his first degree murder conviction in the Sacramento

19   County Superior Court, case number 05F01223, for which he is serving life in prison without the

20   possibility of parole.

21                        II.  BACKGROUND

22          Mays was charged with the first degree murder of Sheppard Scott, with a special

23   circumstance of lying-in-wait and an enhancement for personal discharge of a firearm causing

24   death.  The state court of appeal summarized the evidence adduced at trial:

25          Yalandria Narcisse testified she was the victim's girlfriend and
            was with him when he was shot.[FN2] Around 4:30 a.m. on January
26          24, 2005, they were in a car waiting to order food at the Jack In

                                  1

The Box drive-through on Norwood Avenue. Two persons standing outside the adjacent AM/PM asked if the victim had any weed, and he said no. The victim told Narcisse one of the two persons insulted him, calling him a "bitch-ass nigger or something." She said she did not hear that. The victim got out of the car and engaged in an animated conversation with the two persons, during which the victim stated a gang affiliation. As the victim walked back to the car, Narcisse saw one of the persons, dressed in orange (an Orioles jacket), pass something to the other person, who was dressed in a gray hooded sweatshirt. The victim collected the food and drove to the exit. Somebody yelled, "hey, homey," and the victim stopped the car. The gray-clad male came up to the car and said he wanted to apologize. The victim said to forget about it. The person in gray held out his hand to shake. The victim, still seated in the car, held out his hand. The person in gray pulled out a gun, fired several shots at the victim, and ran off (following the person in the orange jacket).

> FN2. Narcisse, who was not the victim's only girlfriend, had misdemeanor convictions for prostitution and loitering with intent to commit prostitution. In a hearing on admissibility of her prior convictions for impeachment, she acknowledged the victim was her pimp.

Narcisse (and other witnesses) said the shooter fired the gun with his right hand. [Mays] (and others) testified [Mays] is left-handed. Narcisse testified, "The guy in the gray sweater took out his hand, took out his hand to shake, to shake Sheppard's and then Sheppard stuck out his hand and when the guy pulled out his hand he had a gun and he started shooting." This would only make sense if the shooter had the gun in the hand other than the one he extended to shake hands. Narcisse thought the shooter had gold teeth ([Mays] does not have and denies ever having worn gold teeth), and from her seated position she thought the shooter stood about 5 feet 1 inch tall ([Mays] is 5 feet 7 inches tall).

Narcisse and the victim had been drinking alcohol that night. The police did not determine the extent of Narcisse's drinking.

An autopsy revealed the victim, who had a blood alcohol level of .11 percent, was shot six times.

Surveillance cameras at AM/PM did not capture images of the shooting but did capture images of the persons wearing gray and orange and shows one of them pointing at the victim's vehicle as it passes through the AM/PM parking lot on its way to Jack In The Box. The images of the suspects are not clear.

Witness Sharla Flores was across the street, heard the shots, looked and saw the male in the gray sweatshirt, whom she had encountered earlier that night, firing a gun at a car. When shown a

photo lineup, she indicated [Mays]'s photo could possibly be the shooter. She rated her level of certainty as five out of 10. When shown the AM/PM photo, she said it looked like the shooter (four on a scale of 10) but she could not tell because she could not make out the face in the photo. She believed the shooter used his right hand but was not positive.

Lisa Faupula, who was pumping gas at the AM/PM, saw a young Black male rapidly approach a car, pull out a gun, fire multiple shots with his right hand ([Mays] testified he is left-handed), and run off. She estimated his height at 5 feet 7 or 8 inches. She "guessed" his weight at 145 or 150 pounds. She said he wore a white "doo-rag" on his head, tied in back with a piece of cloth hanging down, and white trousers. (The pants of the gray-clad male in the AM/PM photo appear to be white or gray.) She admitted her eyesight was not good and she was in shock. She was unsure whether the gray-clad person in the AM/PM photo was the shooter and could not identify anyone.

Edward Kim was pumping gas. He noticed a male wearing an orange jacket walk past him. Kim returned his attention to his task, then heard gunshots, turned, and saw two persons running away—the male in the orange jacket, and another male wearing dark clothing.

The prosecution sought (over defense objection) to conduct a conditional examination of Tamara Schallenberg, a neighbor who considers [Mays] like a son, on the ground she had phobias precluding testimony in open court. A psychiatry resident who treated her testified Schallenberg has a panic disorder with agoraphobia, characterized by sudden onset of shortness of breath, chest pain, dizziness, and extreme fear. Schallenberg has reported passing out when a panic attack brought on an asthma attack. The doctor did not believe Schallenberg was faking. The doctor said Schallenberg may be able to testify if she takes a sedative, but the risk was oversedation. The court allowed a conditional examination of Schallenberg in a courtroom, in the presence of the judge, court staff, counsel for both sides, and [Mays]; the jury and the public were excluded. The conditional examination was videotaped. The court found the witness's infirmity made her unavailable to testify in open court. The videotaped conditional examination was played for the jury in open court.

In her conditional examination, Schallenberg denied making statements to the police, including identification of [Mays] and his brother as the persons depicted in the AM/PM photos. She testified that she told the officer the person in the photo might be [Mays], but she was not sure. She testified she never saw [Mays] wear a light gray sweatshirt. She denied ever seeing [Mays] deal drugs and denied that he ever said he was a gang member. Schallenberg testified she has known [Mays] since 1999, and he is like a son to

her. She admitted that one day in January 2005, she received a phone call from [Mays]'s mother around 5:00 a.m. As a result of the call, Schallenberg went out looking for [Mays], but she did not find him. The next day, she saw [Mays] and asked him what was going on. [Mays] said he was with his brother at the AM/PM, and his brother shot somebody. In her conditional examination, Schallenberg said [Mays] laughed when he told her, but it was a "scared" laugh. Schallenberg also admitted that she and [Mays] had a telephone conversation while he was in jail, in which he said the investigator said she should testify in court that she made false statements to the police because she was mad at [Mays].

Detective Charles Husted testified about his audiotaped interview of Schallenberg. He showed Schallenberg the AM/PM photo, and she stated without hesitation that the person in the gray sweatshirt was [Mays]. Husted asked how she knew, and she said she knew because she knows him. She also recognized his sweatshirt, which he wore all the time, which had "South Pole" written on its back.[FN4] She also said the person in the orange Orioles hat and jacket was [Mays]'s older brother "Rico" (Deladier Montue). Husted said Schallenberg said [Mays] laughed like "he thought it was funny" when he told her about his being at the AM/PM when his brother shot someone. Husted said Schallenberg said [Mays] said he was a gang member, and she had seen him apparently selling drugs.

> FN4. No lettering is apparent on the sweatshirt in the AM/PM photos. A gray hooded sweatshirt bearing the lettering "South Pole" was seized when [Mays] was arrested. However, the People acknowledge [Mays]'s South Pole sweatshirt is not the sweatshirt depicted in the AM/PM photos.

When shown a book of mug shots, Narcisse focused on a photograph of someone other than [Mays] and said he looked like the shooter. After the interview with Schallenberg, the police showed Narcisse a photo line-up. Narcisse focused on photo number three ([Mays]) and said everything about it looked like the shooter, and she believed it was the shooter.

Flores, the witness who stood across the street, also identified photo number three as "possibly" the shooter, expressing her certainty level as five on a scale of one to 10. At trial, Flores said her certainty level was four that the gray-clad person in the AM/PM image was the shooter.

[Mays]'s girlfriend, Judy Perez, testified she never spoke with [Mays] about the shooting. She denied telling the police that [Mays] said his brother was involved. After the prosecutor showed Perez portions of her videotaped conversation with police, she admitted she told them that [Mays] said his brother was involved

4

(though she did not remember telling them that).

Detective Husted testified he questioned [Mays], who initially denied any involvement, denied being present at the shooting, and denied being the gray-clad person in the AM/PM photo. [Mays] said the police had no murder weapon. When asked how he knew that, [Mays] said it was common sense, and they would have locked him up if they had a weapon, and his brother said the police went to his home looking for the weapon. [Mays] denied telling Schallenberg about a shooting at the AM/PM.

[Mays] repeatedly asked the detective for a lie detector test. Because no polygraph examiner was available, the detective's supervisor authorized a mock polygraph test, i.e., the police placed on his body patches connected to wires, pretended to administer a lie detector test, fabricated written test results, showed [Mays] the fake results, and told him the results showed he failed the test. The detective suggested that perhaps [Mays] failed because he was present during the crime and felt some guilt about that. [Mays] then admitted he was present at the shooting, and he was the person wearing the gray sweatshirt in the AM/PM photo, but he said he knew nothing about the shooting in advance and did not participate. He said the shooter was the person in orange, whom [Mays] had just met that day. The day after the shooting, the shooter found [Mays] and threatened him. [Mays] admitted gang membership. [Mays], who cut his hair after the shooting, first said his brother made him cut it, but he did not remember why. [Mays] immediately thereafter said he guessed the reason was because his cousin said the victim's brother mistakenly thought [Mays] was involved and was hunting for him. The videotaped police interview of [Mays] was played for the jury.

[Mays] testified at trial. He is left-handed. He denied ever wearing jewelry or gold teeth (as some witnesses described the shooter). He denied shooting Sheppard Scott and denied even being present when Scott was shot. He claimed his inconsistent statements to the police were false admissions given only because he felt defeated after the fake lie detector test, which he did not know was fake, and he just said what the police wanted to hear. [Mays] admitted prior trips to Juvenile Court for fleeing police officers while driving; none of his prior misconduct involved assault with a gun. He admitted selling drugs and being a member of a street gang. The defense tried to call as a witness Marcos Adams (also known as Marcus Adams), but he invoked his Fifth Amendment right and refused to answer questions.[FN5]

> FN5. A week before trial started, Adams told a defense
> investigator that he was the person in the orange jacket,
> the person in the gray sweatshirt was a "hustler" named
> Jon Jon and not [Mays] (whom Adams knew through
> his friendship with [Mays]'s brother), and Adams left

1    the scene before the shooting. As we discuss *post,*
2    Adams was the subject of [Mays]'s motion for new
     trial.

3    *People v. Mays*, 174 Cal.App.4th 156, 159-63 (3rd Dist. 2009) (footnote omitted).

4    On this evidence, a jury convicted Mays of first degree murder with a lying-in-

5    wait special circumstance and a personal firearm discharge enhancement.  The trial court denied

6    the defense motion for new trial. Mays's age (17) precluded the death penalty and the court

7    sentenced him to life in prison without the possibility of parole for the special circumstance

8    murder, plus a consecutive term of 25 years to life for the gun enhancement.

9    Mays appealed his convictions to the California Court of Appeal, Third District,

10    where judgment was affirmed in a partially published opinion.  A petition for review to the

11    California Supreme Court was denied.

12    III.  GROUNDS FOR RELIEF

13    Mays asserts five grounds for relief:

14    A.    The trial court erred in denying the his *Batson/Wheeler* motion after the
         prosecutor used a peremptory challenge to excuse a prospective Black juror;
15

16    B.    The trial court erred in allowing witness Schallenberg to testify by conditional
         examination taken and recorded outside the presence of the jury and the public
17       and subsequently played in open court;

18    C.    The trial court erred in admitting Mays's statement taken in violation of *Miranda*
         *v. Arizona*, 384 U.S. 436 (1966);

19    D.    The trial court erred in admitting Mays's statements coerced by
20       administration of a fake polygraph test; and

21    E.    The trial court erred in denying his motion for a new trial to the extent it was
         based on a violation of *Brady v. Maryland*; 373 U.S. 83 (1963).

22    For the reasons that follow, these grounds are without merit and the petition

23    should be denied.

24    IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

25    An application for writ of habeas corpus by a person in custody under judgment

26    of a state court can be granted only for violations of the Constitution or laws of the United

1   States.  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993);

2   *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107,

3   119 (1982)).  This petition for writ of habeas corpus was filed after the effective date of, and thus

4   is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v.*

5   *Murphy*, 521 U.S. 320, 326 (1997); see also *Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).

6   Under the AEDPA, federal habeas corpus relief is also precluded for any claim decided on the

7   merits in state court proceedings unless the state court's adjudication of the claim:

8             (1) resulted in a decision that was contrary to, or involved an
               unreasonable application of, clearly established Federal law, as
9             determined by the Supreme Court of the United States; or

10             (2) resulted in a decision that was based on an unreasonable
               determination of the facts in light of the evidence presented in the
11             State court proceeding.

12   28 U.S.C. § 2254(d); see also *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

13   *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

14        This court looks to the last reasoned state court decision to determine whether the

15   law applied to a particular claim by the state courts was contrary to the law set forth in the cases

16   of the United States Supreme Court or whether an unreasonable application of such law has

17   occurred.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919.

18   The state court's factual findings are presumed correct if not rebutted with clear and convincing

19   evidence.  28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004).  It is

20   the habeas corpus petitioner's burden to show the state court's decision was either contrary to or

21   an unreasonable application of federal law.  *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

22                            V.  DISCUSSION

23       A.     Peremptory Challenge Against Juror D.S.

24        Prospective juror D.S. was a 39-year-old female who lived in midtown

25   Sacramento.  She worked for the Department of Social Services in the unit dealing with the

26   Interstate Compact for Placement of Children and had previously worked for eight years as a toll

collector and office technician.  She was single and a high school graduate.  Her father was a real estate broker and her mother was retired.  Her brother-in-law was a correctional officer.

D.S. said that she did not participate in any political movement, organization, or advocacy group.  She said she did not communicate with any inmates and had never served on a jury.  She would neither believe nor disbelieve a witness until she heard their reasoning.  She had no unpleasant past experiences with law enforcement.  Her sister was a burglary victim, but that would not affect her judgment as a juror.  She said she had no problem with peace officer credibility and could be a fair juror.  Her hobbies were snowboarding, bowling, and watching basketball games.

When questioned by defense counsel, she said she had no problem listening to others and no problem debating others.  When questioned by the prosecutor, she said she did not watch television programs about the criminal justice system but was thinking about starting.  She said her judgment would not be affected by expectations from outside the courtroom, and she would have no problem returning a guilty verdict if the evidence warranted it.

When the prosecutor gave advance notice of an intent to exercise his third peremptory challenge to excuse D.S., the defense made a *Batson/Wheeler* motion.  The court stated for the record that the venire had included three Black persons, one of whom had been excused for cause (both parties agreed he should be excused due to his stated memory difficulties).  That left D.S. and one other Black person who was ultimately seated as a juror.  The trial court found a prima facie case for *Batson/Wheeler* challenge, but ultimately denied the motion.

The Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the basis of race.  *Batson v. Kentucky*, 476 U.S. 79 (1986).  *People v. Wheeler* is "the California counterpart to *Batson*" (*Yee v. Duncan*, 463 F.3d 893, 896 (9th Cir. 2006)); however, the standards of *Batson* control this court's disposition of the case.  *Lewis v. Lewis*, 321 F.3d 824, 827 & n.5 (9th Cir. 2003).

1    When a defendant asserts that a prosecutor's peremptory challenge is racially-

2    motivated, a trial court applies a three-step process to evaluate the *Batson* claim.  *See Hernandez*

3    *v. New York*, 500 U.S. 353, 367 (1991).  First, the defendant must make a prima facie showing

4    that the prosecutor exercised a peremptory challenge on the basis of race.  *Batson*, 476 U.S. at

5    96-97.  Once a prima facie case is established, the burden shifts to the state to articulate a race-

6    neutral explanation for the challenge.  *Id*. at 97.  In the third and final step, the trial court must

7    determine whether defendant has carried his ultimate burden of proving purposeful

8    discrimination by evaluating the prosecutor's reasons and making a credibility determination.

9    *McClain*, 217 F.3d at 1220 (quoting *Hernandez*, 500 U.S. at 359); *see also Batson*, 476 U.S. at

10   98.

11    Where, as here, the trial court ruled on the ultimate question of intentional

12   discrimination, the preliminary question of whether the defendant made a prima facie showing is

13   moot.  *See Collins v. Rice*, 365 F.3d 667, 677 n.6 (9th Cir. 2004) (overruled on other grounds)

14   (citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991)).  Proceeding directly to the issue of

15   intentional discrimination, therefore, the prosecutor in this case said he found several "red flags"

16   in D.S.'s questionnaire: She had a social worker type of job, was single, and lived in midtown.

17   Also, she wore a "peace symbol button."  The prosecutor concluded D.S. was "left of center"

18   politically, and he did not want her to sit on the jury.

19    In denying the *Batson/Wheeler* motion, the trial court stated the prosecutor had

20   displayed honesty in the past, and his explanation

21           particularly in light of the button is a reasonable explanation.  She
             has a job in a neighborhood [*sic*] and most notably the button
22           which would lead to an inference that she is on the progressive
             side of the equation that would not unreasonably cause a
23           prosecutor some concern particularly in a case involving a juvenile
             tried as an adult.
24

25   (Augmented Reporter's Transcript ("RT" at 297.)  The state appellate court found no grounds for

26   reversal.  *People v. Mays*, No. C057099, unpublished slip op. at 18 (Cal. Ct. App. 3rd Dist June

1   5, 2009).

2          As with any credibility determination, the observations of the trial court are of

3   significant importance. *Batson*, 476 U.S. at 98 n.21; *Snyder v. Louisiana*, 552 U.S. 472, 477

4   (2008) ("We have recognized that these determinations of credibility and demeanor lie peculiarly

5   within a trial judge's province, and we have stated that in the absence of exceptional

6   circumstances, we would defer to the trial court." (internal quotations and citations omitted)); *see*

7   *also Lewis*, 321 F.3d at 830.  "Evidence in the record of objective reasons to strike a juror

8   implies that racial bias did not motivate the prosecutor."  *Boyd v. Newland*, 393 F.3d 1008, 1013

9   (9th Cir. 1987).  If, however, review of the record undermines the prosecutor's stated reasons, or

10  many of the stated reasons, the explanation may be deemed a pretext.  *Lewis*, 321 F.3d at 830-31.

11         The fact that a prosecutor's reasons are "founded on nothing more than a trial

12  lawyer's instincts about a prospective juror" does not diminish the scope of acceptable

13  invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's

14  actions."  *United States v. Power*, 881 F.2d 733, 740 (1989) (quoting *United States v. Chinchilla*,

15  874 F.2d 695, 699 (9th Cir. 1989)).  "Excluding jurors because of their profession, or because

16  they were acquitted in a prior case, or because of a poor attitude in answer to voir dire questions

17  is wholly within the prosecutor's prerogative."  *United States v. Thompson*, 827 F.2d 1254, 1260

18  (9th Cir. 1987).

19         Here, there is support in the record for the state court's conclusion that the

20  prosecutor's peremptory challenge was not based on D.S.'s race.  The prosecutor expressed

21  reasonable bases for the use of the challenge, and the stated reasons were "clear and reasonably

22  specific," (*Purkett v. Elem*, 514 U.S. 765, 768-69 (1995)), as well as race-neutral.  There is no

23  evidence of pretext.

24         The prosecutor's concern about D.S.'s "social worker type of job" falls within the

25  well-settled rule that both occupation and interest or experience in social service or similar fields

26  are permissible, non-discriminatory reasons for exercising peremptory challenges.  *See Messiah*

10

*v. Duncan*, 435 F.3d 186, 200 (2nd Cir. 2006) ("full-time social service provider... might have more sympathy for a defendant" than other panelists)  *Hall v. Luebbers,* 341 F.3d 706, 713 (8th Cir. 2003) ("Occupation is a permissible reason to defend against a *Batson* challenge, and being a social worker could be a legitimate basis to strike a prospective juror."), *cert. denied,* 541 U.S. 996, 124 S.Ct. 2031, 158 L.Ed.2d 505 (2004); *United States v. Smith,* 223 F.3d 554, 569 (7th Cir. 2000) (prosecutor's stated reason to strike a potential juror because she was "a social worker type" who would be "too sympathetic towards the defendants" found non-racial); *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987) ("Excluding jurors because of their profession... is wholly within the prosecutor's prerogative.").

It further appears that the prosecutor's inference regarding D.S.'s political views was a valid basis for peremptory challenge.  The United States Supreme Court has observed that it is appropriate for a party to "use peremptory challenges to eliminate prospective jurors belonging to groups it believes would unduly favor the other side."  *Holland v. Illinois*, 493 U.S. 474, 481 (1990).  Use of peremptory challenges in this manner is a means of eliminating extremes of partiality on both sides, thereby assuring the selection of a qualified and unbiased jury.  *Id.* at 484 (internal quotation marks omitted) (quoting *Batson*, 476 U.S. at 91); *see also United States v. Prince*, 647 F.3d 1257, 1261, 1263 (10th Cir. 2011) (declining to extend *Batson* to prohibit exclusions of jurors based on political or ideological beliefs such as their views on legalization of marijuana); *United States v. Villarreal*, 963 F.2d 725, 729 (5th Cir. 1992) ("Political belief is not the overt and immutable characteristic that race is, and we decline to extend the *Batson* line of cases to this case.").

Mays attacks the prosecutor's other stated reasons that D.S. was a single 39-year old woman and that she lived in midtown.  While these additional pieces of information might not add meaningfully to a conclusion that D.S. was a social worker type who was left of center politically, they were nevertheless race neutral factors.  When evaluating a prosecutor's stated reasons, a reviewing court may look at the record surrounding the disputed peremptory challenge

1   *cumulatively*.  *See Miller-El v. Dretke*, 545 U.S. 231, 265 (2005).  Thus, as the state appellate

2   court explained in this case,

> While it may be unreasonable to say that persons who live in
> midtown are liberals, it is reasonable to say that this person who
> lives in midtown and wears a peace button and works with minors
> in a social services job, might be sympathetic to a 17-year-old tried
> as an adult.

6   *People v. Mays*, No. C057099, unpublished slip op. at 15.

7           Where, as here, no indication of pretext is apparent, comparative juror analysis

8   can be a useful tool to evaluating the plausibility of a prosecutor's stated reasons in light of all

9   the evidence.  *See Miller-El*, 545 U.S. at 241 n.2; *see also Kesser v. Cambra*, 465 F.3d 351, 361

10  (9th Cir. 2006) ("in *Miller-El*, the [Supreme] Court made clear that the comparative analysis is

11  required even when it was not requested or attempted in state court").  In this case, the state

12  appellate court employed comparative juror analysis and found that no other prospective jurors

13  were similarly situated to D.S.:

> [Mays] says the prosecutor did not excuse juror number one, who
> expressed opposition to the death penalty, a position which [Mays]
> claims is generally considered to indicate a left-of-center political
> orientation.  We question [Mays]'s assumption, but in any event
> opposition to the death penalty (which was not even at issue in this
> case) did not render that person similarly situated to D.S., who
> makes her living providing social services to children. [Mays] says
> the prosecutor did not excuse jurors numbers three, six, seven, and
> eight, all of whom were unmarried men living in areas that were
> urban, "fairly urban" (Rancho Cordova), or "fairly densely
> populated" (Fair Oaks).  Again, however, these points do not make
> these persons similarly situated to D.S.  None of them worked as a
> social worker or wore a peace button to court.

> We do not suggest [Mays] had to show a "cookie cutter"
> comparison in order to prevail.  [Mays] quotes from *Miller-El v.*
> *Dretke*, *supra*, 545 U.S. at page 247, footnote 6, that the defendant
> need not show "an exactly identical [W]hite juror," matching "all
> characteristics" of the challenged juror, in order to prevail in a
> *Batson* motion.  However, in *Miller-El*, the prosecutor excused a
> Black person (Fields) who expressed unwavering support for the
> death penalty but also said the possibility of rehabilitation might be
> relevant.  Fields believed anyone could be rehabilitated, but this
> belief would not stand in the way of his making a decision to
> impose the death penalty.  (*Id.* at pp. 242-243.)  When asked to

12

1    justify the peremptory challenge, the prosecutor said it was the
     death penalty matter and mischaracterized the prospective juror's
2    testimony.  When defense counsel pointed out the
     mischaracterization, the prosecutor added as another reason for the
3    strike the fact that Fields's brother had a prior conviction.  (*Id*. at p.
     246.)  In finding *Batson* error, the Supreme Court said, "when we
4    look for nonblack jurors similarly situated to Fields, we find strong
     similarities as well as some differences. [Fn. omitted.] But the
5    differences seem far from significant...." (*Id*. at p. 247.)  The fact
     that the prosecutor's stated reason concerning the death penalty
6    also applied to other panel members, most of them White, none of
     them struck, was evidence of pretext.  (*Id*. at p. 248.) The
7    defendant did not have to show the other panel members had
     brothers with criminal convictions in order to prevail.  (*Id*. at p.
8    247, fn. 6.)

9    [Mays] fails to show the prosecutor accepted jurors who were
     similarly situated to the challenged panel member.

10

11   *People v. Mays*, No. C057099, unpublished slip op. 17-18.  The state court further noted the

12   prosecutor also used a peremptory challenge to excuse G.M., a non-Black potential juror who

13   worked as a youth counselor and caseworker specialist for the Youth Authority.  *People v. Mays*,

14   No. C057099, unpublished slip op. at 14.

15          The state court's determination that no other panel members were similarly

16   situated to D.S. was consistent with Supreme Court precedent and based on a reasonable

17   determination of facts in the record.  Mays fails to rebut the presumption of correctness of the

18   state court's factual finding that the prosecutor in this case did not have discriminatory intent.

19   *See* 28 U.S.C. § 2254(e)(1); *Rice v. Collins*, 546 U.S. 333, 341-41 (2006) (Even where

20   "reasonable minds reviewing the record might disagree about the prosecutor's credibility, [ ] on

21   habeas review that does not suffice to supercede the trial court's credibility determination.").

22   For all the reasons discussed, rejection of this claim was not contrary to, or an unreasonable

23   application of clearly established Supreme Court precedent.

24          B.      Testimony by Video-taped Conditional Examination

25          As set forth, the prosecution moved to conduct a conditional examination of

26   witness Schallenberg.  The trial court held a hearing pursuant to section 402 of the California

1   Evidence code in which a second-year psychiatry resident, Dr. Julie Young, testified

2   Schallenberg has panic disorder and agoraphobia, causing sudden onsets of shortness of breath,

3   chest pain, dizziness, and extreme fear.  Her panic attacks can cause asthma attacks and in the

4   past have caused her to pass out.  The doctor opined there should be as few people as possible in

5   the room if Schallenberg were to testify.  In opposition, the defense put on evidence that

6   Schallenberg previously had two meetings with the prosecution's investigator in a windowless

7   room without suffering a panic attack.  She also exhibited no signs of distress or shyness when

8   she was questioned at her home.  At one point she fetched what appeared to be an asthma inhaler

9   but did not use it.

10          Over the defense's objection that Shallenberg's condition did not warrant a

11   conditional examination, the trial court granted the motion and held a videotaped conditional

12   examination of Schallenberg in a courtroom, with Mays, counsel, and the judge present, but

13   excluding the jurors and the public.  Shallenberg was subject to cross-examination by defense

14   counsel.

15          After the conditional examination, the court found Schallenberg unavailable to

16   testify at trial.  The court stated on the record observations that Schallenberg was visibly

17   trembling and shaking at various points during the protracted amount of time it took for her to

18   adjust to the room and during the first few minutes of her testimony.  (Her demeanor while

19   adjusting to the room was not videotaped.)  She displayed breathing difficulty and twice used her

20   inhaler, which seemed to help.  After a while, she seemed fine and was even "feisty" in her

21   answers.  The court said it had intended to do a "supplementary voir dire" before beginning her

22   testimony, in order to determine whether or not she could testify in front of the jury, but based on

23   the observations of the witness and the doctor's opinion, the court concluded it was not necessary

24   and may have jeopardized getting the conditional examination.  The court said the witness's

25   ability to give "feisty" answers did not change the ruling because the ruling was based on the

26   court's concern that she would suffer an attack and go into rapid breathing and pass out.  Her

1 ability to handle the conditional examination was credited in part to the measures taken, such as

2 keeping to a minimum the number of people in the courtroom.

3      The videotape of Schallenberg's conditional testimony was played for the jury in

4 open court.  Mays claims this manner of presentation violated his Sixth Amendment right to a

5 public trial as well as his due process rights under the Fifth and Fourteenth Amendments.  He also

6 contends state law prohibited conditional examination testimony in his case.

7      On appeal, the state court found no error in the trial court's use of Schallenberg's

8 conditional examination testimony; this determination of state law is not reviewable here.  *See*,

9 *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Mays further contends the state's failure to

10 meet its own statutory requirements violated his procedural and substantive due process rights.

11 This conclusory assertion, unsupported by further allegation, also fails.  *See Brown v. Allen*, 344

12 U.S. 443, 458, n.6 (1953) (allegations of fact, rather than conclusory assertions, are required)

13 (overruled on other grounds in *Townsend v. Sain*, 372 U.S. 293 (1963)); *see also Langford v. Day*,

14 110 F.3d 1380, 1389 (9th Cir. 1997) (a petitioner may not "transform a state-law issue into a

15 federal one merely by asserting a violation of due process").

16      The Sixth Amendment guarantees a defendant the right to a public trial (*Presley v.*

17 *Georgia*, 130 S.Ct. 721 (2010); *Waller v. Georgia*, 467 U.S. 39, 48, 49 n.9 (1984)), applicable to

18 the states through the Fourteenth Amendment.  *In re Oliver*, 333 U.S. 257, 273 (1948).  "The

19 requirement of a public trial is for the benefit of the accused; that the public may see he is fairly

20 dealt with and not unjustly condemned, and that the presence of interested spectators may keep

21 his triers keenly alive to a sense of their responsibility and to the importance of their functions...."

22 *Waller*, 467 U.S. at 46 (internal quotations and citations omitted).  For this reason, before *totally*

23 *closing* any part of a trial to the public,

24          [t]he party seeking to close the hearing must advance an overriding
           interest that is likely to be prejudiced, the closure must be no
25          broader than necessary to protect that interest, the trial court must
           consider reasonable alternatives to closing the proceeding, and it
26          must make findings adequate to support the closure.

15

1  *Presley*, 130 S.Ct. at 724 (quoting *Waller*, 467 U.S. at 48); *see also Press Enterprise v. Superior*

2  *Court of Cal.*, 464 U.S. 501, 510-11 (1984); *but see United States v. Sherlock*, 962 F.2d 1349,

3  1357 (9th Cir. 1992) (holding that *partial closures* are subject to less stringent requirements than

4  set forth in *Waller*).  Because a violation of the right to a public trial is structural error, no specific

5  prejudice need be shown in the case of a total closure.  *See Waller*, 467 U.S. at 49-50.  The right

6  to a public trial is not absolute, however, and must give way in some cases to other interests

7  essential to the fair administration of justice.  *See Id*. at 45.

8        Although Supreme Court precedent provides the only relevant source of clearly

9  established federal law for AEDPA purposes, circuit precedent can be "persuasive authority for

10  purposes of determining whether particular state court decision is an 'unreasonable application'

11  of Supreme court law," and in ascertaining "what law is 'clearly established.'" *Duhaime v.*

12  *Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000).  The Second Circuit has held that an unjustified

13  closure that does not undermine the values furthered by the public trial guarantee does not violate

14  the Sixth Amendment.  *Peterson v. Williams*, 85 F.3d 39, 42-43 (2nd Cir. 1996).  Several other

15  circuits have relied on *Peterson* to determine whether a closure implicates an accused's right to a

16  public trial.  *See*, *e.g.*, *Braun v. Powell*, 227 F.3d 908, 919 (7th cir. 2000); (applying *Peterson* to

17  hold that the exclusion of a single excused juror from the trial did not implicate the right to a

18  public trial); *United States v. Al-Smadi*, 15 F.3d 153, 154-55 (10th Cir. 1994) (applying *Peterson*

19  to hold that the brief and inadvertent closure of the courtroom did not implicate the Sixth

20  Amendment).  The Ninth Circuit has applied *Peterson* to hold that a trivial closure of routine jury

21  administrative matters does not violate the Sixth Amendment where the closure does not

22  "involve[ ] the values that the right to a public trial serves[.]"  *United States v. Ivester*, 316 F.3d

23  955 (9th Cir. 2003) (citing *Peterson*, 85 F.3d at 43 and *Waller*, 467 U.S. at 46-47).

24        In this case, as to Mays's contention that the conditional examination violated his

25  federal right to a public trial, the state court held:

26  /////

1    [W]e disagree.  A conditional examination is not a part of the trial;
     rather, it is a deposition taken in cases where a material witness is
2    unavailable to testify in person at trial. ([Cal. Penal Code] §
     1345;FN 9 *People v. Watkins* (1996) 45 Cal.app.4th 485, 488.) The
3    videotaped examination was played for the jury in open court, with
     no exclusion of the public.

4

5            FN 9    Section 1345 provides that if a conditional
                     examination is videotaped, "that video-recording
6                    may be shown by either party at the trial if the court
                     finds that the witness is unavailable as a witness
7                    within the meaning of Section 240 of the Evidence
                     Code.

8    *People v. Mays*, No. C057099, unpublished slip op. at 54.

9            Mays fails to identify any authority demonstrating that rejection of his claim in this

10   manner was contrary to or an unreasonable application of *Waller* or other clearly established

11   Supreme Court precedent.  Even assuming, for the sake of argument, that Schallenberg's

12   conditional examination constituted at least a partial closure, it was too trivial to implicate the

13   Sixth Amendment.  The conditional examination was relatively brief in duration.  *See Ivester*, 316

14   F.3d at 960 ("very brief" closure to question jurors found too trivial to implicate the Sixth

15   Amendment); *Peterson*, 85 F.3d at 43 (20 minute closure found too trivial).  It was also limited to

16   the testimony of a single witness.  The conditional examination was taken because of the court's

17   stated concern for the witness's health and also to ensure the witness's testimony could be

18   received at trial where the court did not believe that the witness would otherwise be able to

19   testify.  Significantly, Schallenberg's conditional examination was recorded and played for the

20   jury in open court, with no exclusion of the public.

21           Any partial closure, if there was one, was for a "substantial reason" and was

22   narrowly tailored to satisfy the purposes for which the exclusion was ordered.  *Sherlock*, 962 F.2d

23   at 1356-57 (partial closure justified to protect victim witness who was apprehensive of testifying

24   before the defendant's family); *United States v. Eisner*, 533 F.2d 987, 993-94 (6th Cir.), *cert.*

25   *denied*, 429 U.S. 919 (1976) (partial closure justified to protect witness with fear of testifying in

26   public).  No relief is available.

C.      Admission of Mays's Statements to Police

Over Mays's objection, the trial court admitted statements he made to law enforcement after they allegedly failed to honor his request for counsel.  Mays claims a violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

Mays was interviewed by Detective Husted on February 9, 2005 regarding the AM/PM murder.  Husted read Mays his *Miranda* rights and proceeded to interrogate him.

Mays said he understood he was in custody for the victim's murder, but he had nothing to do with it and was not present.  Husted said witnesses had identified him.  Mays denied being the person depicted in the photo from the AM/PM video and said he did not own a similarly-colored gray sweatshirt.  Husted left the room and returned with a photo which Mays admitted was him.  Husted said the second photo was merely a photocopy of the photo, darkened to make the sweatshirt look darker.  Husted told Mays to stop lying.  Mays asked for a lie detector test, which he guaranteed he would pass "a hundred percent."  Husted expressed doubt.  The following exchange ensued:

> [MAYS]: Can you – can you give me a lie detector test?  I guarantee you I'll pass a hundred percent.
>
> DET. HUSTED: [Unintelligible.]
>
> [MAYS]: And that's all – what you going to say then?
>
> DET. HUSTED: Well, I don't think you'll pass personally.
>
> [MAYS]: Look.  Can I – can I call my dad so I can have a lawyer come down 'cause I'm – I'm telling you, I'm –
>
> DET. HUSTED: Call who?
>
> [MAYS]: My – my step-dad 'cause I'm – I'm going to tell you I'm going to pass that test a hundred percent.
>
> DET. HUSTED: Okay.  Well, we don't need your step-dad right now.
>
> [MAYS]: I know.  He got my lawyer.
>
> DET. HUSTED: Who's your lawyer?

[MAYS]: My – my step-dad got a lawyer for me.

DET. HUSTED: Okay.  So what do you want to do with him?

[MAYS]: I'm going to – can – can you call him and have my lawyer come down here?

DET. HUSTED: [Unintelligible.]

[MAYS]: I'm telling you – I'm telling you this is not me.

DET. HUSTED: Well, it – you've been identified.

[MAYS]: Can you give me a lie detector test?

DET. HUSTED: [Unintelligible.]

[MAYS]: I'll guarantee you I'll pass it.

DET. HUSTED: [Unintelligible.]

[MAYS]: What you all – and what you all going to say then?

DET. HUSTED: Well, I don't –

[MAYS]: What you all going to say when I pass it?

DET. HUSTED: I don't think you'll pass.

[MAYS]: I guarantee you I'll pass it.

DET. HUSTED: Well, I don't – I don't think –

[MAYS]: Can I get one?

DET. HUSTED: Yeah.  I will.

[MAYS]: Can I get one?

DET. HUSTED: Do you want – do you want to make a statement about what happened?

[MAYS]: I'm telling you this is not me, sir.

DET. HUSTED: Okay.

[MAYS]: I'm not – I'm not going to sit here and lie to you.

DET. HUSTED: All right.

[MAYS]: You can give me a lie detector test, and I'll guarantee you

1        I'll pass it.

2        DET. HUSTED: And you weren't out there?

3        [MAYS]: I was not up there. I was at Ramone house. I'm going to
tell you the whole night that – what – what – what, ah, the night –

4

5        DET. HUSTED: Well, it's up to you. I mean, do you want the
attorney down before you make the statement or do you want to
make a statement and tell me what's going on?

6

7        [MAYS]: I want a lie detector test.

8        DET. HUSTED: Okay. I – it's going to take a minute for me to set
that up.

9        [MAYS]: Sir.

10       DET. HUSTED: Do you want to tell me the story or do you want
me to (unintelligible)?

11

12       [MAYS]: I'm telling you – I'm telling you – ask Ramone where I
was the day that the sho – that the stuff that happened. He going to
tell you I was at his house sleeping on the couch. I was at his house
for two weeks.

13

14       DET. HUSTED: I – I tri – I already asked him that. He knows –

15       [MAYS]: I was at his house for two weeks straight.

16       DET. HUSTED: Okay.

17       [MAYS]: And if I'm not there, I'm at – I'm at my girl auntie house
sleep. I'm telling you, sir, this is not me at all.

18

19       DET. HUSTED: All right. Do you mind answering some questions.

20       [MAYS]: Yes, sir.[1]

21  (CT at 2784- 2787.) Mays continued to answer questions, denying involvement or presence at the

22  crime scene. Husted left the room at one point and then returned.

23       DET. HUSTED: Looks like I may have found somebody to do it
for you. Okay? Give you the polygraph. Still working on

24       (unintelligible). But I just wanted to clarify and make sure that I'm

25

26      [1] Mays's "body language on the video indicated he meant yes, he would answer
questions." *People v. Mays*, No. C057099, unpublished slip op. at 22.

1
> not violating your Miranda Rights or anything like that.  Um, do
> you want to do the polygraph and talk to the person?  Answer the
2
> questions?  Is that what you want to do?

3
> [MAYS]: Yes, sir.

4
> DET. HUSTED: Okay.  Well, you – you had mentioned something
> about your step-dad having an attorney for you and so I said I don't
5
> want to violate your Miranda Rights and do all that.  But it seems
> like you're being cooperative, so I just want to get a clear idea of
6
> where you're coming from.

7
> [MAYS]: Huh?

8
> DET. HUSTED: I was – (cough) – excuse me.  I was getting some
> peanuts.  I just want to get a clear idea of where you're coming
9
> from.  Do you want to talk to the polygraph guy?  Go through his
> questions?
10
> [MAYS]: Yeah.
11
> DET. HUSTED: So you're willing to do that?
12
> [MAYS]: Yes, sir.
13

14  (CT at 2800-01.)  An examiner purported to administer a polygraph and told Mays that he failed.

15  Mays then made various incriminating statements including that he was present at the scene of the

16  murder.

17           After considering the taped interview in conjunction with the transcript during

18  pretrial proceedings, the trial court gave its ruling and reasoning for admitting Mays's statements:

19
> This is a tape, I'll observe by way of background, where frequently
> [Mays] is talking very high speed and even on top of the detective
20
> and vice versa.  But with regard to [Mays's statement] – can you
> call him and have my lawyer come down here? [– it is] a statement
21
> which is clear to the detective.

22
> Indeed, the detective immediately [-] and I believe the word is can,
> but it is hard to hear it [-] [i]mmediately starts to follow with what I
23
> surmise is a clarification or confirmation depending on your point
> of view.
24
> But he is interrupted immediately before he can get beyond the first
25
> word with [Mays]'s protestation of innocence and his return to a
> constant theme which is that he wants a lie detector test.
26

1
2
3

> At this point, the defense asked me to find that there's an unequivocal unambiguous invocation of right to counsel in the context of this interview and to make the binary decision that the officer at that point had to terminate the interview and leave the room.  This is an argument that is not frivolous.

4
5

> It's close in my mind and I memorialize that only because I think I should out of fairness to [Mays], because if this is an appellate issue, I think [it] is helpful for the Appellate Court to know that I wrestled with this a bit.

6
7
8
9

> But after listening to it multiple times, I was unsure and I think a reasonable officer would be unsure as to whether or not he was asserting his right to have a lawyer come down then for the interview, or whether or not he wanted on his own to continue with the interview and specifically get the lie detector test which he had been demanding.

10   (RT at 240-41.)  The trial court noted that Husted continued to attempt to "clarify" what Mays

11   wanted and that Mays's responses were "inconsistent with the invocation by behavior."  (RT at

12   242.)  Relying on Husted's repeated attempts to clarify Mays's wishes and Mays's responses, the

13   trial court ultimately concluded:

14
15

> So I believe given the totality of the circumstances, the request although in isolation and read separately would probably constitute a proper assertion of the rights.

16
17
18
19

> Read in context of how it is delivered and the continual assertion of his desire to have a lie detector test and protest his innocence to the point where the officer is having a difficult time seeking the clarification to make sure he wants the attorney now there prior to questioning as opposed to proceeding and doing the lie detector test and having the attorney at some other point; ultimately, the officer after asking [four] specific questions and attempting actually one more gets an answer to go forward.

20
21

> I believe that's an effective waiver, and I so rule.

22   (RT at 243-44.)

23          On appeal, the state court held, first, that Mays's request for counsel was

24   equivocal.  The state appellate court found May's question, to be "analytically indistinguishable

25   from the request for counsel made in [*People v.*] *Roquemore*," in which the second district of the

26   California Court of Appeal found the statement "Can I call a lawyer or my mom to talk to you?"

1  to be equivocal.  *People v. Mays*, No. C057099, unpublished slip op. at 29.  The state court

2  further held:

> However, even assuming that [Mays]'s question could constitute a
> facially unequivocal request for counsel, the request must be
> evaluated in the context of the interrogation in which it occurred, as
> the trial court recognized.  In this respect, we have viewed the
> videotape of the interrogation and have concluded that there is an
> enormous difference between the impression of the cold written
> transcript and the actual interrogation on the videotape.  Thus, less
> than a second occurs between [Mays]'s question ["can you call him
> and have my lawyer come down here?"] and [Mays]'s statement,
> "I'm telling you – I'm telling you this is not me."  Perhaps another
> second occurs between that statement of [Mays] and his next
> question, "Can you give me a lie detector test?"  In other words,
> this phase of the interrogation occurred in a matter of seconds.  The
> videotape shows that the detective was trying to clarify whether
> [Mays] wanted to talk to his lawyer or whether he wanted the lie
> detector test that he kept demanding.  In this respect, the detective
> asked [Mays] on two different occasions whether he wanted to talk
> to his lawyer and on both occasions [Mays] said that he did not.

13  *People v. Mays*, No. C057099, unpublished slip op. at 30.  The state appellate concluded:

14  "[c]onsidering all circumstances, we agree with the trial court that there was no *Miranda*

15  violation."  *People v. Mays*, No. C057099, unpublished slip op. at 31.

16          When a person in custody is subjected to interrogation, he must first be read his

17  *Miranda* rights in order for the information obtained to be admissible in court.  *Miranda v.*

18  *Arizona*, 384 U.S. 436, 467-68 (1966).  "Statements elicited in noncompliance with this rule may

19  not be admitted for certain purposes in criminal trial."  *Stansbury v. California*, 511 U.S. 318, 322

20  (1994) (per curiam).

21          Police are not required to obtain an express waiver of *Miranda* rights before

22  proceeding with interrogation.  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (holding that

23  courts can infer a waiver of *Miranda* rights "from the actions and words of the person

24  interrogated").  If at any point during an interrogation a suspect invokes his right to counsel,

25  however, all questioning must cease and may not resume in the absence of counsel unless the

26  suspect himself waives the right by initiating further discussions.  *Edwards v. Arizona*, 451 U.S.

477, 484-85 (1981); *see also Smith v. Illinois*, 469 U.S. 91, 95 (1984).

Whether the accused has invoked his right to counsel is an objective inquiry. *Davis v. United States*, 512 U.S. 452, 459 (1994).  "A suspect must unambiguously request counsel."  *Id*.  He must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.  *Id*.  At a minimum,

> the suspect must make some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.  But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

*Id*. (internal quotations and citations omitted).  Utterances which include the words "might," "maybe," or "perhaps" are generally deemed ambiguous.  *E.g., Davis*, 512 U.S. at 455 ("Maybe I should talk to a lawyer" held ambiguous); *United States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005).  If a request is ambiguous or equivocal police may, but are not required, to ask clarifying questions.  *Davis*, 512 U.S. at 461-62; *see also Connecticut v. Barrett*, 479 U.S. 523, 534 ("[C]ircumstances may clarify an otherwise ambiguous [invocation].") (Brennan, J., concurring in judgment).

"[A] statement either is such an assertion of the right to counsel or it is not." *Davis*, 512 U.S. at 459 (quoting *Smith*, 469 U.S. at 97-98).  For this reason, an accused's *postrequest* responses to further police questioning cannot be used to cast doubt on the clarity of the initial request.  *Smith*, 469 U.S. 91, 100 (1984) (explaining that subsequent statements are relevant only to the question whether the accused has waived the right he invoked).[2]  This rule exists to discourage police, after an accused requests counsel, from asking additional questions

---

[2] Mays's postrequest responses should not be used to find that he invoked his right and then quickly waived it again- because in order for such a waiver to be found, the interrogation had to cease for a period of time.  *See Smith*, 469 U.S. at 98 ("[W]e accordingly have emphasized that a valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation."") (quoting *Edwards*, 451 U.S. at 484).

1    "in the hope that the defendant might be induced to say something casting retrospective doubt on

2    his initial statement...." *Id*. at 99.  In *Smith*, the suspect made a plain request for counsel while

3    receiving his *Miranda* warnings followed closely by other statements in which he essentially

4    agreed to talk to police without counsel present.  The state supreme court found the statements,

5    considered as a totality, to be ambiguous and determined that the accused had not invoked the

6    right to counsel.  The Supreme Court reversed, holding that "an accused's *postrequest* responses

7    to further interrogation may not be used to cast retrospective doubt on the clarity of the initial

8    request itself."  *Id*. at 100 (emphasis in original).

9            Under *Smith*, it is irrelevant whether further police questioning seeks "clarifying"

10   or "material" information.  *Smith*, 469 U.S. at 98 ("Where nothing about the request for counsel

11   or the circumstances leading up to the request would render it ambiguous, *all questioning* must

12   cease.") (emphasis added).  In *Smith*, the officer simply continued giving the suspect his *Miranda*

13   rights and those continued questions were found to constitute impermissible "police-initiated

14   custodial interrogation."  *Id*. at 98.

15           In this case, therefore, if either or both of Mays's statements ["can I call my dad so

16   I can have a lawyer come down...." or "can – can you call him and have my lawyer come down

17   here?"] were an unequivocal request for counsel, then his subsequent statements returning to his

18   theme of wanting take a lie detector test cannot be used to cast doubt on the clarity of his original

19   request because the latter statements were made in response to clarifying questions by Husted.

20           As explained in Justice O'Connor's opinion for the Supreme Court in *Williams v.*

21   *Taylor*, 529 U.S. 362, 412-13 (2000), a state court acts contrary to clearly established federal law

22   if it applies a legal rule that contradicts prior Supreme Court holdings.  Whether the state court's

23   decision in this case applied a legal rule contradictory to the holding of *Smith* hinges on whether

24   Mays's made a request for counsel that was clear and unambiguous.  This is because the holding

25   of *Smith* was premised on the *unambiguous* assertion of the right to counsel: the Court

26   emphasized its decision was "narrow" and did not address "the circumstances in which an

25

1  accused's request for counsel may be characterized as ambiguous or equivocal as a result of

2  events preceding the request or of nuances inherent in the request itself," or the consequences of

3  such ambiguity or equivocation.  *Smith*, 469 U.S. at 99-100.  Thus the issue is whether a

4  reasonable argument exists that Mays's alleged request for counsel was "merely" a question or

5  was otherwise ambiguous due to any preceding statements or nuances in the request itself, or

6  whether it was a clear, unequivocal request for counsel.  If Mays made a clear, unequivocal

7  request for counsel, the state court's holding that his subsequent statements and the totality of

8  circumstances rendered the request equivocal was contradictory to the holding of *Smith.*

9          The Ninth Circuit recently upheld as a reasonable application of clearly established

10  Supreme Court precedent a state court's finding that a suspect's pre-*Miranda* waiver question

11  whether he was entitled to a lawyer *was not* an actual invocation of the right to counsel.  *Sessoms*

12  *v. Runnels*, 650 F.3d 1276, 1288 (2011).  In so holding, the *Sessoms* court noted:

13              When Sessoms asks if he is entitled to an attorney, his inflection,
             body language, and manner support he state court's conclusion that
14              he was completely unaware if he even had a right to counsel under
             the circumstances and was only asking if he *could* request counsel.

15

16  *Id*. at 1288.

17          *Sessoms*, however, is distinguishable because there the accused asked whether he

18  was entitled to a lawyer *before* he was advised of his *Miranda* right to that effect; in contrast,

19  Mays had been advised of his *Miranda* rights and had given an implied waiver of those rights by

20  continuing to talk to Husted.  *See Butler*, 441 U.S. at 373 (suspect can implicitly waive *Miranda*

21  rights).  The standard of *Davis* that a suspect must articulate his desire to have counsel present

22  sufficiently clearly that a reasonable police officer in the circumstances would understand the

23  statement to be a request for an attorney applies only to *post-waiver* requests.  *See Sessoms*, 650

24  F.3d at 1283 (citing *Davis*, 512 U.S. at 460-61).  The *Sessoms* court therefore applied as the

25  relevant clearly established law the standard of *Edwards* that an accused must "actually invoke[ ]

26  his right to counsel" (*Edwards*, 451 U.S. at 485), making the petitioner's burden in that case "that

1  much more difficult." *Sessoms*, 650 U.S. at 1285.

2          This case is also different from *Sessoms* because it is undisputed that Husted read

3  Mays his *Miranda* rights at the beginning of the interview in question and Mays indicated that he

4  understood those rights.  Thus a reasonable officer in Husted's position had no occasion to

5  believe that Mays was actually unaware whether he could invoke his right to counsel such that his

6  statements ["can I call my dad so I can have a lawyer come down...." or "can – can you call him

7  and have my lawyer come down here?"] could be interpreted "merely" as questions.  Nor were

8  the statements otherwise ambiguous.  *See Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999)

9  (three questions: "(1) Can I get an attorney right now, man?; (2) You can have attorney right

10 now?; and (3) Well, like right now you got one?" constituted an unambiguous request for counsel

11 because although phrased as questions, it was clear the suspect wanted an attorney "right now");

12 *Smith v. Endell*, 860 F.2d 1528 (9th Cir. 1988) ("Can I talk to a lawyer" was clear invocation of

13 the right to counsel); *United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005) ("can I have a

14 lawyer" and "could I get a lawyer" held unambiguous).

15         Here, Mays's statements "can I call my dad so I can have a lawyer come down,"

16 and further, "can – can you call him and have my lawyer come down here," should have both

17 been "reasonably construed as an expression of a desire for the assistance of an attorney," and "a

18 reasonable police officer in the circumstances would [have understood] the statement to be a

19 request for an attorney."  *See McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991); *Davis*, 512 U.S. at

20 459.  No "events preceding the request or [ ] nuances inherent in the request itself" made either of

21 Mays's statements requesting counsel ambiguous.  *Smith*, 469 U.S. at 100.  Rather, he clearly

22 asked Husted twice to call his step-dad for the purpose of having his lawyer "come down here."

23 (CT at 2784-85.)  When Husted asked Mays "Who's your lawyer?", Mays responded "my step-

24 dad got a lawyer for me."  Husted followed this up with "Okay. So what do you want to do with

25 him?"  Mays responded "I'm going to – can – can you call him and have my lawyer come down

26 here?"  These words were clear and understandable on the videotape.

1        Based on a viewing of the videotape and the words used, it is apparent that Mays

2  made not one, but two unambiguous requests for counsel which were clear and understandable.

3  His immediate and subsequent demands to take a lie detector test "may not be used to cast

4  retrospective doubt on the clarity of [his] initial request." *Smith*, 469 U.S. at 100.  Under *Smith*, it

5  is irrelevant that, as the state court found, "less than a second occurs between [Mays]'s statement

6  ["can you call [him] and have my lawyer come down here?"] and [Mays]'s next statement, "I'm

7  telling you – I'm telling you this is not me." *People v. Mays*, No. C057099, unpublished slip op.

8  at 22.  It is further irrelevant that "[p]erhaps another second occurs between that statement of

9  [Mays] and his next question, "Can you give me a lie detector test?" *People v. Mays*, No.

10  C057099, unpublished slip op. at 22.  Since Mays made an unequivocal request for counsel,

11  Husted was obligated to cease all questioning, including questioning for "clarification" purposes.

12  *Smith*, 469 U.S. at 98.  When the state court relied on Mays's responses to Husted's "clarifying"

13  inquiries and Mays's repeated demands for a lie detector test to render his request for counsel

14  ambiguous or equivocal under the totality of circumstances, that was contrary to the holding of

15  clearly established Supreme Court precedent. *See Smith*, 469 U.S. at 100; *Fare v. Michael C.*,

16  442 U.S. 707, 719 (1979) (discussing the "rigid rule" that "an accused's request for an attorney is

17  *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease").

18        Regardless of whether Mays's statements should have been suppressed, however,

19  the state court's rejection of the claim should stand because the state court's finding of no

20  prejudice is a reasonable application of clearly established Supreme Court precedent.  The state

21  appellate court set forth a lengthy analysis rejecting Mays claim of prejudice:

22          Even assuming for the sake of argument that *Miranda* violation
            occurred, it would not require reversal of the judgment.
23

24          The erroneous denial of [Mays]'s motion to suppress the evidence
            is subject to harmless error analysis under the beyond-a-reasonable-
            doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17
25          L.Ed.2d 705].  (*People v. Neal, supra*, 31 Cal.4th 63, 86.)  The
            admission of evidence obtained in violation of *Miranda* does not
26          require reversal of the judgment if the admission of the evidence

was harmless beyond a reasonable doubt.  (*Cunningham, supra*, 25 Cal.4th at p. 994.)

[Mays] acknowledges that, since he testified at trial that he was not even present during the crime, his admission that he was the person in the gray sweatshirt may have been admissible to impeach him, notwithstanding the *Miranda* violation.  (*Harris v. New York* (1971) 401 U.S. 222, 225-226 [28 L.Ed.2d 1] [otherwise trustworthy statements obtained in violation of *Miranda* could properly be used to impeach [Mays]'s credibility, since *Miranda's* shield could not be perverted into a license to use perjury by way of defense, free from the risk of confrontation with prior inconsistent utterances].)  A statement taken in violation of the *Sixth Amendment* right to counsel would not be admissible (*People v. Riskin* (2006) 143 Cal.App.4th 234, 243), but [Mays]'s statements to police antedated the initiation of adversary criminal proceedings that would trigger his Sixth Amendment rights.

[Mays] argues the evidence should not have been admissible for impeachment purposes in this case, because the detective's "apparently intentional refusal to honor appellant's request for counsel may have rendered the ensuing statements by appellate involuntary and so inadmissible even for impeachment."  However, "a statement deliberately obtained in violation of *Miranda* safeguards, but otherwise voluntary, is admissible for impeachment under *Harris*, *supra*, 401 U.S. 222, 224." (*People v. DePriest* (2007) 42 Cal.4th 1, 32-33.)  Police misconduct is a factor to be considered in determining whether a defendant's statements are voluntary in light of all surrounding circumstances.  (*Neal, supra*, 31 Cal.4th at p. 68.)  Here, we perceive absolutely no police misconduct.

Nor do factors such as [Mays]'s youth lead to a conclusion that his statements were involuntary.  During the first two hours of the videotape, [Mays] continues to deny everything.  It is not until after the fake polygraph test that he makes the incriminating statements and, even then, he admits only presence at the crime scene.  (We reject, *post*, [Mays]'s argument that the polygraph deception rendered his admissions inadmissible.)  Thus, we cannot say any earlier *Miranda* violation made his statements involuntary.

We conclude that [Mays]'s admissions that he was the person in the gray sweatshirt present at the crime scene would have been properly admitted as evidence to impeach his testimony that he was not present. (*DePriest*, *supra*, 42 Cal.4th at pp. 32-36.)  For this reason, any *Miranda* violation is harmless beyond a reasonable doubt.

In any event, even apart from impeachment purposes, we see no prejudice requiring reversal with respect to the prosecution's use of the evidence in its case in chief.

Thus, the evidence obtained from [Mays]'s interrogation was [Mays]'s admissions that he was at the crime scene, wearing the gray sweatshirt, and knew the police had not recovered the weapon.

In attempting to show prejudice, Mays picks apart the evidence from witnesses who were uncertain about their identification, persons who rated their level of certainty as four or five on a scale of 10, and witness discrepancies in physical description (e.g., height, skin tone, gold teeth or jewelry, and witness testimony that the shooter fired the gun with his right hand, whereas Mays is left-handed).  He suggests that, without his statements to the police, there was little basis for his conviction.  What Mays glosses over, however, is Tamara Schallenberg's definitive identification of [Mays] when shown the AM/PM photo by the detective.  (We reject *post* [Mays]'s challenge to the use of her conditional examination at trial.)  Schallenberg knows [Mays] well and had no uncertainty in her initial identification.  That she later tried to recant the identification when she realized its effect on [Mays], whom she considers like a son, does not diminish the impact of her original statement.

*People v. Cunningham* (2001) 25 Cal.4th 926, found a *Miranda* violation harmless beyond a reasonable doubt, in part because, "The jury may have considered defendant's statements as evidence that he was present at the [crime scene] on the night of the murder, but the jury was able to consider the same evidence in far greater detail through the testimony of several other witnesses."  (*Id.* at p. 994.)  Here, the other evidence included not only Schallenberg's initial positive identification of the surveillance photo, but also her initial statement to the police that Mays admitted to her that he was present at the crime scene.

[Mays] argues prejudice is shown by the prosecutor's opining in closing argument that his statement to police was important evidence.  (*People v. Cardenas* (1982) 31 Cal.3d 897, 909; *People v. Cruz* (1964) 61 Cal.2d 861, 868.)  However, the question of prejudice is for this Court, not the prosecutor, to decide.  Moreover, while the prosecutor viewed [Mays]'s statements to police as important, he specified they were important as *corroboration* for the other evidence, including (1) Schallenberg's positive identification of [Mays] as the gray-shirted person in the AM/PM surveillance photo, and (2) [Mays]'s statements to Schallenberg about his presence at the crime scene.

We reject [Mays]'s argument that prejudice is demonstrated by the fact the jurors deliberated more than 12 hours, indicating this was a close case.

*People v. Mays*, No. C057099, unpublished slip op. at 31-35.  The state appellate court went on to

address and reject Mays's argument, premised on state law, that the erroneous admission of

30

1  statements obtained in violation of *Miranda* compelled his trial testimony.  The state appellate

2  court concluded that, assuming a *Miranda* violation occurred, it was harmless beyond a

3  reasonable doubt."  *People v. Mays*, No. C057099, unpublished slip op. at 39.

4          Granting a writ of habeas corpus for *Miranda* error is only required if the error was

5  not harmless.  *See Arizona v. Fulminante*, 499 U.S. 279, 292 (1991) (noting that the Courts of

6  Appeals have uniformly held *Miranda* violations are subject to treatment as harmless error) *see*

7  *also Ghent v. Woodford*, 279 F.3d 1121, 1126 (9th Cir. 2002).  The rule of *Chapman v.*

8  *California*, 386 U.S. 18, 24 (1967), applies; constitutional errors that are harmless beyond a

9  reasonable doubt do not justify reversing a conviction.  On habeas corpus review, a federal court

10  must additionally assess the prejudicial impact of constitutional error in a state court criminal trial

11  under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S.

12  619 (1993).  *Fry v. Pliler*, 551 U.S. 112 (2007).  The relevant question is whether the *Miranda*

13  violation "had substantial and injurious effect or influence in determining the jury's verdict."

14  *Brecht*, 507 U.S. at 637 (internal quotation marks and citation omitted).  Thus, in order to grant

15  habeas corpus relief where a state court has determined that a constitutional error was harmless, a

16  reviewing court must determine: (1) that the state court's decision was contrary to or an

17  unreasonable application of Supreme Court harmless error precedent, and (2) that the petitioner

18  suffered prejudice under *Brecht* from the constitutional error.  *Inthavong v. LaMarque*, 420 F.3d

19  1055, 1059 (9th Cir. 2005).  Both of these tests must be satisfied before relief can be granted.  *Id*.

20          As the state court discussed, Mays testified at trial that he was neither present

21  during the shooting nor involved in it.  His statement to the contrary that he was present at the

22  scene wearing the gray hooded sweatshirt was admitted, as well as his statement that he knew

23  police had not recovered the weapon.  Although these statements were injurious to Mays's

24  defense, they did not have a substantial effect on the verdict since there was other strong evidence

25  that he was present at the scene of the crime, including "(1) Schallengberg's positive

26  identification of [Mays] as the gray-shirted person in the AM/PM surveillance photo, [ ] (2)

1  [Mays]'s statements to Schallenberg about his presence at the crime scene" (*People v. Mays*, No.

2  C057099, unpublished slip op. at 35), and, to a lesser extent, identification by the other

3  eyewitnesses.

4           In particular, Schallenberg testified that Mays told her he was present at the time

5  of the shooting.  (RT at 903.)  When police showed Schallenberg a picture from the surveillance

6  video she identified him as the individual in the gray sweatshirt.  (RT at 1020-22.)  Schallenberg

7  was well acquainted with Mays and was not at all uncertain in her initial identification.  That she

8  later tried to recant the identification when she realized its effect on Mays, whom she considered

9  to be like a son, does not diminish the impact of her original statement.  On this record, Mays fails

10  to demonstrate that the state court's finding of no prejudice was an unreasonable application of

11  the *Chapman* standard.  No relief is available.

12           D.       Fake Polygraph Test

13           After Mays's asked for and agreed to take the polygraph, Husted left the room,

14  returned, asked more questions, brought in Mays's girlfriend and left the room while they talked.

15  Husted returned.  Mays asked to make a phone call.  Husted said he would try to set up a phone,

16  then changed the subject to getting the girlfriend home and left the room with the girlfriend.

17           A purported examiner administered a fake polygraph to Mays and showed him a

18  graph of fabricated written results which the examiner said showed he was lying about not being

19  involved.  (Clerk's Transcript ("CT") at 2832-93.)  Husted then continued to interrogate Mays.

20  When Mays expressed disbelief that he had failed the polygraph, Husted suggested that maybe

21  Mays had seen the crime and felt guilty about lying about his presence.  As discussed, Mays then

22  admitted he was present and that he was the person in the gray sweatshirt depicted in the AM/PM

23  surveillance tape.  Mays said he witnessed the shooting, which was committed by the person

24  wearing orange whom he had met that night while smoking marijuana.  Mays said he did not

25  know the shooter's name or motive.  Mays said had withheld this information because the shooter

26  had made threats and knew where his family lived.  (CT at 2877-2892.)

1    When Husted revealed that three witnesses said the shooter was the person dressed

2  in gray, not orange, Mays insisted he did not shoot the victim, repeatedly asked to talk to his

3  mother, and broke down crying.  He said he wanted to say goodbye to his mother and kill himself.

4  He continued to emphatically deny having shot the victim.  The interrogation ended when Mays

5  complained of chest pains and said he was born with a hole in his heart.

6    Mays claims his incriminating statements were coerced by the fake polygraph test

7  and the fabricated documentary results.  In the published portion of the decision on appeal, the

8  state court examined the circumstances of the fake polygraph and found no grounds for reversal.

9  *People v. Mays*, 174 Cal. App. 4th at 166-69.

10    The United States Constitution demands that confessions be made voluntarily in

11  order to be admissible at trial.  *Lego v. Twomey*, 404 U.S. 477, 478 (1972).  A confession is

12  voluntary if it is "the product of a rational intellect and a free will."  *Medeiros v. Shimoda*, 889

13  F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)); *see also*

14  *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  The test for voluntariness, however, is not a

15  simple question of whether the suspect spoke of free will.  Rather, "coercive police activity is a

16  necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the

17  Due Process Clause of the Fourteenth Amendment."  *Colorado v. Connelly*, 479 U.S. 157, 167

18  (1986).

19    Under some circumstances, misrepresentations by police can render a confession

20  invalid.  *See*, *e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confession coerced by officers'

21  false statements that state financial aid for defendant's infant children would be cut off and her

22  children taken from her if she did not cooperate); *Spano v. New York*, 360 U.S. 315, 323 (1959)

23  (confession coerced where police instructed a friend of the accused to falsely state that

24  petitioner's telephone call had gotten him into trouble, that his job was in jeopardy and that loss

25  of his job would be disastrous to his three children, his wife, and his unborn child).  However,

26  "misrepresentations made by law enforcement in obtaining a statement, while reprehensible, does

1    not necessarily constitute coercive conduct [*sic*]."  *Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th

2    Cir. 2002).  The fact that police engaged in trickery or misrepresentations, while relevant to the

3    determination of admissibility, is insufficient on its own to render an otherwise voluntary

4    confession inadmissible.  *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (confession admissible

5    even though officer falsely told the suspect his accomplice had been captured and confessed);

6    *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 495 (9th Cir. 1997) (suspect falsely told he had been

7    identified by an eyewitness).

8         Rather, a "totality of circumstances" test applies.  *Frazier*, 394 U.S. at 739;

9    *Winthrow v. Williams*, 507 U.S. 680, 711-12 (1993).  The relevant question is whether it appears,

10   by preponderance of the evidence, that petitioner's statements were the result of his will being

11   overborne by coercive police conduct.  *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991) (whether

12   suspect's statement is "the product of coercion" by law enforcement depends on whether his "will

13   was overborne"); *Connelly*, 479 U.S. at 168 (reaffirming that "the voluntariness of a confession

14   need only be established by a preponderance of the evidence").  Relevant factors to consider may

15   include the youth of the accused, lack of education, low intelligence, lack of advice to the accused

16   of his constitutional rights, the length of detention, the repeated and prolonged nature of the

17   questioning, or the use of physical punishment such as deprivation of food or sleep.  *Schneckloth*

18   *v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also Yarborough v. Alvarado*, 541 U.S. 652, 668

19   (2004).

20        Here, the state court reasoned, in part:

21        In California, it has been held that if a defendant takes a lie detector
          test willingly, "'neither the fact it was given nor the fact that the
22        defendant was told by the test giver it revealed in his opinion that
          defendant was not telling the truth, inherently demonstrates
23        coercion.

24        Courts in other states have held defendants' confessions/admissions
          voluntary where the police told the defendant he or she failed a
25        polygraph test, when no real test was performed, or a real test was
          given but did not show deception by the defendant, or the police
26        misled the defendant as to the accuracy of the test or its

34

admissibility in court. (E.g., *People v. Serrano* (2005) 14 A.D.3d 874, 788 N.Y.S.2d 272 [confession voluntary despite police (apparent) deception in informing the defendant that he failed a polygraph examination]; *People v. Sobchik* (1996) 228 A.D.2d 800, 644 N.Y.S.2d 370 [confession voluntary where defendant was hooked up to a polygraph, but it was not turned on]; *Contee v. United States* (D.C.1995) 667 A.2d 103, 104 [affirmed conviction based on confession obtained after the police (perhaps) untruthfully told the 17–year–old defendant that he failed a computer voice stress analyzer, when in fact the test did not so indicate, or did so unreliably]; *State v. Farley* (1994) 192 W.Va. 247, 452 S.E.2d 50 [police misrepresentations to defendant concerning performance on polygraph test did not invalidate confession].)

Here, we disagree with [Mays]'s view that the police engaged in shocking and outrageous misconduct. The request for a polygraph examination was initiated by [Mays], not by the police. The deception was a mock polygraph. A polygraph is designed to elicit the truth, and the police already had information from other sources that defendant was the shooter (including Schallenberg's identification of [Mays] as the gray-clad person in the AM/PM photo, and eyewitness statements that the gray-clad person was the shooter). The use of the mock polygraph was not likely to produce a false confession. Although [Mays] testified he believed polygraphs are 100 percent accurate, that belief was not induced by the police. Moreover, we know the trickery was not particularly coercive because, even after the police showed [Mays] the fake test results, [Mays] continued to deny involvement in the crime. He merely admitted being present at the scene wearing a gray sweatshirt. It was other evidence, other than [Mays]'s statements, which gave his admission its weight, i.e., the AM/PM surveillance photo of a gray-clad male, Schallenberg's identification of [Mays] as the gray-clad male in the photo, and the testimony of eyewitnesses that the gray-clad male was the shooter. (Although the prosecutor used [Mays]'s admissions in closing argument to the jury, he used them as corroboration for the other evidence.)

We thus agree with the People that [Mays]'s ability to admit being present, while steadfastly denying participation, demonstrates that his will was not overborne by the police ruse.

[Mays] claims coercion is established by the police showing him a fake graph (from the fake polygraph) as "supposedly constituting irrefutable scientific proof" that he lied. Having viewed the video and transcript of this exchange, we disagree with [Mays]'s characterization. The police made no representations about scientific accuracy, and the officer posing as a polygraph examiner merely said the graph "showed deception."

[Mays] cites case law from other states holding that police fabrication of *tangible* evidence to cause a defendant to confess is

coercive per se, or is a factor pointing to coercion under a totality of circumstances test. First, in our case, [Mays] did not confess to any criminal involvement, but merely admitted he was at the scene. Second, no one sought to introduce the test graph as evidence of guilt. Third, we are not bound by cases from other states. Though we may consider decisions of other states, [Mays] concedes there is no consensus among the other states, but rather a split as to whether tangible documents are coercive per se or a factor to be considered.

We see no reason to apply a rule that would make the fake graph coercive per se. [Mays]'s cited authority, *Cayward, supra,* 552 So.2d 971, felt the need for a "bright line" test between verbal and documentary deception, because the Florida court felt a "spontaneous distaste" for the use of fake documents; documents are permanent and facially reliable; and there is a danger their falsity may be forgotten and they may be mistaken for the truth. We feel confident our courts are capable of deciding voluntariness without a bright line making all documents automatically coercive. While we might view some fake documents as coercive, e.g., a fake search warrant, we see no reason to treat the police misrepresentations differently in this case depending on whether they merely told [Mays] he failed a polygraph test or told him he failed while showing him a fake graph. Since the graph merely showed squiggly lines with handwritten notations such as "intend to lie" and is useless as evidence without testimony from a certified polygraph examiner, there is no risk of its presence in the record being mistaken for a true polygraph test somewhere down the road.

Considering the tangible graph paper as one of the totality of circumstances, we still conclude [Mays]'s statements were voluntary and not coerced.

[Mays] claims the evidence shows his admission about being present at the crime scene was a false admission, because he got some things wrong, i.e., he said the victim's passenger was a male, and he pointed out as the shooting site a location which did not match the location where the expended shells were found. We disagree.

This case is distinguishable from [Mays]'s cited authorities finding confessions involuntary. Thus, *In re Shawn D.* (1993) 20 Cal.App.4th 200, 24 Cal.Rptr.2d 395, said police deception (telling the minor that witnesses could identify him and that his girlfriend would get in trouble if he did not confess, and misrepresenting that he would be tried as an adult and sent to San Quentin), while "not commendable," might not be enough to demonstrate the defendant's will was overborne, but were enough when added to the police's repeated suggestions that the minor would be treated more leniently if he confessed. *People v. Esqueda* (1993) 17 Cal.App.4th 1450, 22 Cal.Rptr.2d 126, found a confession involuntary where the police, besides falsely claiming to have evidence against the defendant

(dying declaration of victim, fingerprints, a witness, etc.)
questioned the defendant for eight hours with little, if any, respite;
ignored his repeated invocations of the right to remain silent; told
him what they wanted him to say and that they would not stop until
they got what they wanted; and threatened him that his silence
would result in greater charges.

We conclude the mock polygraph test and fake test results do not
warrant reversal of the judgment. We have no occasion to consider
a situation where the police, not the defendant, initiate a demand
that defendant take a polygraph.

*People v. Mays*, 174 Cal. App.4th at 166-168 (some citations omitted).

Mays fails to demonstrate that the state court's finding of voluntariness was contrary to, or an unreasonable application of clearly established Supreme Court precedent. To the extent he argues it was the nature of the polygraph being fake that was coercive, the argument fails. As set forth, misrepresentations and trickery by the police are permissible under clearly established Supreme Court precedent and are only one factor of the totality of circumstances to be considered. *Frazier*, 394 U.S. at 739; *Schneckloth*, 412 U.S. 218. Considering the other factors, although Mays, at 17 years old, was relatively young, there is no evidence he lacked education or intelligence. He had been advised of his constitutional rights, which is "quite relevant to a finding of voluntariness." *Frazier v. Cupp*, 394 U.S. at 739 (1969) (citing *Davis v. North Carolina*, 384 U.S. 737, 740-41 (1966)). Finally, Mays was not deprived of food, sleep, or otherwise physically punished, and nothing about the length of detention or nature of questioning supports a finding of coercion. Under the circumstances of this case, use of a fake polygraph was not inherently coercive, and the state court's rejection of this claim was not contrary to, or an unreasonable application of clearly established Supreme Court precedent.

E.      Motion for New Trial

In a motion for a new trial, Mays asserted that the prosecution committed *Brady* error (*see Brady v. Maryland*, 373 U.S. 83 (1963)) by failing for more than a year to disclose to the defense a taped statement and report of police interviews with John Harris, a jail inmate. Harris allegedly implicated another person, Marcos Adams, in the AM/PM murder case. Police

1    Detective Thomas Higgins reported the conversation to the prosecutor in Harris's case, but word

2    did not reach the prosecutor in Mays's case.  The information was not shared with Mays's

3    defense until July 2007 (after his jury returned the guilty verdict in May 2007).

4              A hearing was held on the new trial motion, with live testimony later summarized

5    by the court of appeal as follows:

6              John Harris, now a prison inmate, testified that one night he was
             hanging out with some friends a few blocks from the Jack In The
7              Box.  He heard gunshots and, shortly thereafter, [Marcos] Adams
             (wearing a black hooded sweatshirt) ran up, breathing hard,
8              accompanied by a Black teen (whom Harris did not know), also
             wearing a black hooded sweatshirt.  Adams said he had just
9              "handled some business" at "Jack In The Crack" and needed a ride
             to get away from the area.  Harris said no, and Adams and his
10            companion ran off.  Harris and Adams never discussed the matter
             again.  Harris's friend "ATL" wore an orange jacket as he hung out
11            with Harris's group that night.  Harris testified to his opinion that
             Adams is not a truthful person.

12

13            Police detective Thomas Higgins testified that in March 2006, he
             received a phone call from John Harris in jail, saying he had
14            information about several murders, including the AM/PM murder.
             Higgins went to the jail, where Harris said Marcos Adams (the
15            detective initially thought the reference was to Marcus Patterson,
             but Harris corrected him) killed someone at Jack In The Box.
16            Harris said Adams said he "got into it with some rickets" (a
             derogatory term for the Crips gang).  Higgins reported Harris's
17            statements to the prosecutor who was handing Harris's case.[3]

18            Defense investigator Lori Brown testified that three months before
             trial, [Mays] first told her that his brother Deladier Montue said
19            someone named "Marcus" was involved in the crime.  Brown had
             previously interviewed the brother twice in prison; he said he knew
20            nothing about the crime and was home asleep when it happened.
             Brown testified she visited Adams in prison twice in April 2007,
21            but he did not confess.  Brown's written report about the visits
             indicated Adams admitted he was the person in the Orioles (orange)
22            jacket in the AM/PM surveillance photo.

23    *People v. Mays*, No. C057099, unpublished slip op. at 56-57.

24    /////

25    _____

26         [3] Harris denied initiating the contact with Higgins.  Harris also denied telling Higgins that
    Adams said Adams killed the victim or that Adams said he got into it with some rickets.

1          Following argument by counsel, the trial court denied the motion for a new trial.

2    In recognition of the closeness of the matter, the trial court detailed the facts supporting its

3    reasoning.  On appeal, the court summarized the trial court's findings and reasoning:

4          In March 2006, Harris related to Detective Higgins that Adams
           killed a man and called Harris for a ride.  That statement was not
5          disclosed to defendant.  In April 2007, Adams told defense
           investigator Brown that he was the person in the orange jacket, and
6          the other person was Jon Jon, not [Mays].  (John Harris testified
           some people on rare occasions call him Jon Jon.)  Later in April
7          2007, Adams invoked the Fifth Amendment on the witness stand.
           Harris testified about seeing Adams the night of the shooting, and
8          Detective Higgins testified about what Harris said. [....]

9          The trial court found the prosecution's failure to disclose to [Mays]
           the March 2006 police interview with Harris was a *Brady* violation,
10         but it was unintentional and harmless.  [Mays] already knew about
           the evidence implicating Adams before trial.  Moreover, there was
11         no reasonable likelihood that [Mays] would have prevailed but for
           the error.  The evidence against [Mays] was overwhelming.  There
12         was no doubt the shooter was the one dressed in gray, not orange.
           Multiple independent witnesses said the shooter wore gray.
13         [Mays]'s friend, Tamara Schallenberg, identified [Mays] as the
           gray-clad person in the AM/PM surveillance photo.  [Mays] told his
14         girlfriend and Schallenberg that he was there but was not the
           shooter.  [Mays] admitted to police that he was there and was the
15         gray-clad person in the photo.  The court said the statements
           attributed to Adams all placed [Mays] at the scene, corroborating
16         [Mays]'s admission to the police that he was there.  Adams's
           statements put himself in the orange jacket.  The court concluded
17         Adams's statement would actually have a substantial likelihood of
           hurting [Mays] by merely making Adams's the accomplice, while
18         leaving [Mays] as the actual shooter.

19         [....]

20         The court concluded a more favorable result for [Mays] was not
           reasonably probable, and [ ] denied the motion for new trial.
21

22   *People v. Mays*, No. C057099, unpublished slip op. at 58-59.

23          In *Brady v. Maryland*, the United States Supreme Court held that the suppression

24   before trial of requested evidence favorable to an accused violates due process where the

25   evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

26   the prosecution.  *Brady*, 373 U.S. 83 (1963).  In the *Brady* context, "evidence is material only if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The relevant question is whether, without the information, the petitioner received a fair trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The proper focus is whether the net effect of the undisclosed evidence undermined the outcome of the trial. *Id*. at 421, 436-37.

Here, Adams's alleged statements to Harris, as reported by Harris to detective Higgins, were not exculpatory for Mays.  Evidence that Adams and a friend, both in black sweatshirts, ran up to Harris on the evening in question and asked for a getaway ride saying they had "handled business" or "got into it with some rickets" at "Jack In the Crack" does not undermine confidence in the verdict against Mays.  This is especially true where Adams admitted to Mays's defense investigator that he (Adams) was the person in the orange jacket on the video tape.  As the state court held, this evidence would likely have been seen by the jury to inculpate Mays to the extent it placed Adams at the scene as the accomplice, leaving Mays as the likely shooter.  Although Adams told Mays's defense investigator that the shooter was someone named "Jon Jon," there was substantial evidence as discussed elsewhere herein that Mays was the person wearing the gray sweatshirt in the AM/PM surveillance tape that night.

On this record, there is no reasonable probability that the result of the proceeding would have been any different had Harris's statements to Higgins been made available to the defense. *Cf. United States v. Sarno*, 73 F.3d 1470, 1506-07 (9th Cir. 1995) (undisclosed evidence "tugs at loose threads hanging from the margins of the Government's case, but in no way challenges the bulk of the evidence on which the convictions rest").  The state court's rejection of Mays's *Brady* claim for lack of prejudice was consistent with, and a reasonable application of clearly established Supreme Court precedent.

Moreover, the state court made an explicit factual finding to which this court is bound (*see* 28 U.S.C. §§2254(e)(1)) that the defense was aware of evidence implicating Adams as

a participant to the crime before trial.  In this regard, Mays's brother had named Adams as a

potential suspect, causing the defense investigator to interview Adams three months prior to trial

at which time Adams admitted he was at the scene wearing the orange jacket.  Since suppression

by the government is a necessary element of a *Brady* claim (*Moore v. Illinois*, 408 U.S. 786, 794-

95 (1972)), the Ninth Circuit has explained:

> [I]f the means of obtaining the exculpatory evidence has been provided to the defense, the *Brady* claim fails. [Citations.]  The Eleventh Circuit has expressed this rule succinctly, in rejecting a *Brady* argument based on failure to disclose the statement of a witness, since the prosecution disclosed the *identity* of the witness; "Where defendants... had within their knowledge the information by which they could have ascertained the supposed *Brady* material, there is no suppression by the government." *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983).  *See United states v. Brown*, 582 F.2d 197, 200 (2d Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978).  As Justice White has said, "any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense." *Giles v. Maryland*, 386 U.S. 66, 96, 87 S.Ct. 793, 808, 17 L.Ed.2d 737 (1967) (White, J., concurring).

*United States v. Dupuy*, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985); *see also Coe v. Bell*, 161 F.3d

320, 344 (6th Cir. 1998) ("There is no *Brady* violation where a defendant knew or should have

known the essential facts permitting him to take advantage of any exculpatory information, or

where the evidence is available... from another source...." (internal quotation marks omitted));

*United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997) ("*Brady* does not obligate the

government to produce for [a defendant] evidence or information already known to him, or that

he could have obtained from other sources by exercising reasonable diligence." (internal

quotation marks omitted)); *United States v. Torres*, 129 F.3d 710, 717 (2nd Cir. 1997) ("It is well

settled that evidence is not considered to have been suppressed within the meaning of the *Brady*

doctrine if the defendant or his attorney either knew, or should have known of the essential facts

permitting him to take advantage of [that] evidence." (internal quotation marks omitted)).  In this

regard, witnesses of whom the defense is aware and to whom the defense "had as much access as

the police" are not under the sole control of the government and therefore are not improperly kept

1   from the defense in the *Brady* context.  *See Coe*, 161 F.3d at 344.  No relief is available.

2                                   VI.  CONCLUSION

3                For the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of

4   the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

5   appealability when it enters a final order adverse to the applicant.  A certificate of appealability

6   may issue only "if the applicant has made a substantial showing of the denial of a constitutional

7   right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed, a substantial showing of the denial of

8   a constitutional right has not been made in this case.

9                Accordingly, IT IS HEREBY RECOMMENDED that:

10               1.  The petition for writ of habeas corpus be denied; and

11               2.  A certificate of appealability not issue.

12               These findings and recommendations are submitted to the United States District

13  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

14  one days after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

17  within the specified time waives the right to appeal the District Court's order.  Martinez v. Ylst,

18  951 F.2d 1153 (9th Cir. 1991).  Any reply to the objections shall be filed and served within seven

19  days after service of the objections.

20  DATED: March 26, 2012

21

22                                        *Charlene H. Sorrentino*

23                                        CHARLENE H. SORRENTINO
                                          UNITED STATES MAGISTRATE JUDGE

24

25

26